**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

TLC TRAVEL STAFF, LLC, GENESIS MEDICAL STAFFING, INC., SAMAS CORPORATION, MYNELA LLC, WAYNE STAFFING, LLC, and LIGHTHOUSE NURSING, INC.,

Plaintiffs,

– against –

ACE FUNDING SOURCE, LLC, GREEN NOTE CAPITAL PARTNERS, INC., KYF GLOBAL PARTNERS, LLC, PATRIARCH CAPITAL HOLDINGS, LLC, ACE FUNDING SOURCE SECOND, LLC, UNION FUNDING SOURCE, INC., ALBERT GINDI, ISAAC KASSAB, GABRIEL MANN, ABC CORPORATIONS 1 THOUGH 10 (currently unknown and fictitiously identified entities), and JOHN DOES 1 THROUGH 10 (currently unknown and fictitiously identified individuals),

Defendants.

------------------------------------------------------------------------x

Case No.  1:23-CV-01914-VSB

Civil Action

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAYSE FOR PRELIMINARY INJUNCTION WITH TEMPORARY RESTRAINTS

---

**REPPERT, KELLY & VYTELL LLC**
110 Allen Road, Suite 208
Basking Ridge, New Jersey 07920

570 Lexington Avenue, 8th Floor
New York, New York 10022

Of counsel and on the brief:
    Nicholas A. Vytell, Esq.
    J. Vincent Reppert, Esq.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................................II

PRELIMINARY STATEMENT ...................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................... 5

LEGAL ARGUMENT .................................................................................................................... 10

I.    LEGAL STANDARD .......................................................................................................... 10

II.   A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE NECESSARY TO PREVENT IMMEDIATE,  IRREPARABLE HARM TO PLAINTIFFS, THEIR MEDICAL PROVIDERS, AND THEIR PATIENTS ............................................. 11

III.  THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ............. 12

IV.   THE CLAIMS AGAINST DEFENDANTS ARE LIKELY TO SUCCEED ....................... 14

CONCLUSION ............................................................................................................................... 18

## TABLE OF AUTHORITIES

**Cases**

725 Eatery Corp. v. City of New York,
   408 F. Supp. 3d 424 (S.D.N.Y. 2019) .................................................................................. 10

Abdul Wali v. Coughlin,
   754 F.2d 1015 (2d Cir. 1985) ............................................................................................... 14

AIRS Capital Funding, LLC, v. Green Note Capital Partners, Inc.,
   Supreme Court of State of New York, Kings County, (Index. No. 510382/2019) ..................... 2

Am. Motor Club, Inc. v. Corcoran,
   644 F. Supp. 862 (S.D.N.Y. 1986) ........................................................................................ 11

American Resources Corp. v. C6 Capital, LLC,
   2020 NY Slip Op 34198(U), 2020 N.Y. Misc. LEXIS 10725
   (N.Y. Kings Cty., Dec. 16, 2020) .......................................................................................... 11

Arthur v. Associated Musicians of Greater N.Y.,
   278 F. Supp. 400 (S.D.N.Y. 1967) ........................................................................................ 13

Bell & Howell: Mamiya Co. v. Masel Supply Co.,
   719 F.2d 42 (2d Cir. 1983) .................................................................................................... 10

Fleetwood Servs., LLC v. Ram Capital Funding, LLC,
   No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022) ................... 16

Jackson v. Johnson,
   962 F. Supp. 391 (S.D.N.Y. 1997) ........................................................................................ 10

Lateral Recovery LLC v. Queen Funding, LLC,
   2022 WL 2829913 (21-cv 9607-LGS, S.D.N.Y. July 20, 2022) ............................................. 16

Liberty Haulers, Inc. v. Ace Funding Source, LLC,
   Southern District of New York (Civ. Ac. No. 1:22-07929-LJL) ............................................... 2

Ligon v. City of New York,
   925 F. Supp.2d 478 (S.D.N.Y. 2013) .................................................................................... 13

Little Tor Auto Ctr. v. Exxon Co., USA,
   822 F. Supp. 141 (S.D.N.Y. 1993) ........................................................................................ 10

N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.,
   883 F.3d 32 (2d Cir. 2018) .................................................................................................... 11

NAACP v. Town of E. Haven,
   70 F.3d 219 (2d Cir. 1995) .................................................................................................... 10

Okorie, M.D., v. Ace Funding Source, LLC,
   Southern District of Mississippi, Eastern Division (Civ. Ac. No. 2:17-00002-KS) .................... 2

PrecisionWorks MFG, LLC, v. Union Funding Source, Inc.,
   Southern District of New York, Civ. Ac. No. 1:22-cv-08290(LGS) .......................................... 2

Resolution Tr. Corp. v. Elman,
   949 F.2d 624 (2d Cir. 1991) .................................................................................................. 10

Semmes Motors, Inc. v. Ford Motor Co.,
   429 F.2d 1197 (2d Cir. 1970) ................................................................................................ 14

Two Wheel Corp. v. American Honda Corp.,
    506 F. Supp. 806 (E.D.N.Y. 1980)......................................................................... 11
United States v. Covino,
    837 F.2d 65 (2d Cir. 1988)................................................................................. 15
Zyppah, Inc. v. ACE Funding Source, LLC,
    Southern District of New York, Civ Ac. No. 1:19-cv-1158(ALC)............................ 2

**Statutes**

Florida Stat. § 687.071.......................................................................................... 17
N.Y. Penal Law §190.40......................................................................................... 16

**Rules**

Fed. R. Civ. P. 65(b) ............................................................................................. 10

## PRELIMINARY STATEMENT

This is an action by Plaintiffs, TLC TRAVEL STAFF, LLC, GENESIS MEDICAL STAFFING, INC., SAMAS CORPORATION, MYNELA LLC, WAYNE STAFFING, LLC, and LIGHTHOUSE NURSING, INC. (collectively "Plaintiffs", "TLC", or the "Company"), a group of medical staffing companies based in Florida, to curtail the deceptive, unlawful, and patently criminal "lending practices" of Defendants, ACE FUNDING SOURCE, LLC, GREEN NOTE CAPITAL PARTNERS, INC., KYF GLOBAL PARTNERS, LLC, PATRIARCH CAPITAL HOLDINGS, LLC, ACE FUNDING SOURCE SECOND, LLC, UNION FUNDING SOURCE, INC., ALBERT GINDI, ISAAC KASSAB, GABRIEL MANN (collectively "Defendants"), owners and operators of self-described "merchant cash advance" ("MCA") companies operating out of New York engaged in an illegal scheme to defraud Plaintiffs and others.

The present application for a Preliminary Injunction and Temporary Restraining Order is necessary and warranted to prevent the Company from going out of business and defaulting on the payment of wages to the over 2,000 nurses and other medical care providers that the Company staffs for individuals, hospitals, and institutions nationwide.  The circumstances, as set forth in detail in the Verified Complaint [Docket Entry No. ("Doc.") 1] and briefly below, are extraordinarily dire and of profound public importance – if Defendants' oppressive collection practices are not curbed, even temporarily, the tens of thousands of people who rely on the Company's services will be left without medical care overnight.

The current untenable circumstances are the culmination of a multi-year scheme by Defendants to over-leverage Plaintiffs pursuant to facially illegal MCA agreements and ultimately take them over or force them into a compulsory sale – where Defendants take all the proceeds. This action is the latest in a long string of lawsuits and other legal action, including criminal

1

prosecutions and legislation, necessitated by the unlawful practices engaged in by the MCA industry – modern day loan sharks.  In fact, these same Defendants have previously (and recently) been the subject of nearly identical suits and allegations; including ones in which injunctive relief was necessitated.  See E.g. PrecisionWorks MFG, LLC, v. Union Funding Source, Inc., Southern District of New York, Civ. Ac. No. 1:22-cv-08290(LGS); Zyppah, Inc. v. ACE Funding Source, LLC, Southern District of New York, Civ Ac. No. 1:19-cv-1158(ALC); AIRS Capital Funding, LLC, v. Green Note Capital Partners, Inc., Supreme Court of State of New York, Kings County, (Index. No. 510382/2019); Liberty Haulers, Inc. v. Ace Funding Source, LLC, Southern District of New York (Civ. Ac. No. 1:22-07929-LJL); Okorie, M.D., v. Ace Funding Source, LLC, Southern District of Mississippi, Eastern Division (Civ. Ac. No. 2:17-00002-KS).

Unfortunately, Plaintiffs fell prey to the same scheme Defendants perpetrated in the above-referenced actions.  Under the guise of risk-free, short-term cash-flow, Defendants marketed and sold purported MCA agreements to Plaintiffs that, were, among other things, supposed to be: (i) contingent upon actual receipt of future receivables; (ii) "capped" by a "specified percentage" between 10-12%; and (iii) "flexible" in duration that would automatically extend, as necessary, based on available cash.  This, as the Defendants explained, would ensure that the Company always had sufficient money to fund its ongoing operations.  (**Doc. 1** at ¶ 27).

In reality, Defendants issued intentionally usurious loans that it secured with a panoply of over-reaching security devices including, direct access to Plaintiffs' bank accounts, attorney-in-fact designations to act on the Company's behalf, confessions of judgment, personal guarantees, and, with respect to later loans, purported stock pledge agreements.  Armed with these contractual weapons, Defendants then breached the agreements from the outset by failing and refusing to

2

"reconcile" the loans and limit their withdrawals to the "specified percentage" permitted – instead withdrawing the maximum amount and, at times more, each day, regardless of the available funds.

From 2020 through early 2023, Defendants, through their various entities, issued over sixty separate loans with a total "face value" of $24 million, of which Plaintiffs have repaid over $28 million; however, Defendants continue to demand an additional $23 million as the purported "outstanding balance" on the loans.  The interest on all of these loans far exceeded the maximum rate permitted under New York and Florida law.

The eight (8) outstanding loans issued by Defendants are merely "refinances" of prior MCA agreements issued by Defendants.  ***This fact, alone, is extraordinarily telling – there is no legitimate reason to ever "refinance" under a true MCA agreement, because the term and payments are flexible and based upon the receipts of the Company***.  Defendants intentionally refused to abide by the reconciliation provisions in the original MCA agreements; thereby, intentionally creating the need for refinance loans with additional fees and higher interest.  As it stands, under the outstanding loans, the Company has purportedly pledged an impossible ***104% of its receivables*** and would be responsible for ***$109,847.99 daily*** – which would require annual revenues of in excess of $40 million simply to cover the daily debt.

These were clearly, and intentionally, illegal loans; however, as time has revealed, they were merely part of a more insidious scheme by Defendants.  With its foot on the neck of these companies, Defendants then engaged in a pattern of predatory and illegal practices – threatening unlawful action against its "borrowers" while slowly stacking one loan on top of the next, extorting additional payments and other concessions from Plaintiffs, and, eventually, taking over effective control of the Company under threat of putting them out of business.  As it stands, Defendants have forced Plaintiffs to the brink of a forced sale of the Company or going out of business.

This is an action to unravel Defendants' unlawful conduct and recover millions of dollars in ill-gotten gains stolen from Plaintiffs. This application is designed to maintain the *status quo* pending that disposition. Should the Court fail to intercede at this vital moment, the Company will fail and will default on its payments to its thousands of providers. Any ultimate disposition in Plaintiffs' favor will be moot, as the Company will be destroyed. Perhaps even more importantly, however, those that rely upon the Company's medical providers will be left without care. Defendants, however, will not be injured in any way, if they are ultimately successful, they will be left with the same rights and remedies they would otherwise have as a creditor of the Company. As such, it is respectfully submitted that the Court enter the proposed Order to Show Cause for Preliminary Injunction with Temporary Restraints.

## FACTUAL BACKGROUND

For purposes of brevity, Plaintiffs incorporate by reference the Verified Complaint with Preliminary Injunction and Jury Demand. (**Doc. 1**). The most salient facts with respect to the present application are addressed briefly below.

Plaintiffs provide medical staffing solutions to hospitals, nursing homes, in-home nursing, and other medical providers throughout the country. (Id. at ¶ 21). Over eighty percent of all monies billed and collected by Plaintiffs are for personal medical services and are repaid to its network of over 2,000 nurses and medical providers nationwide in the form of wages. (Id.). Defendants are owners, operators, and/or employees of self-described small business lenders who, in reality, are a closely-related network of predatory lenders and brokers that use so-called "merchant cash advances" ("MCAs"). (Id. at ¶ 23).

In or about late-2019 and early-2020, the demand for Plaintiff's services expanded dramatically during the COVID-19 pandemic. (Id. at ¶ 25). The swift increase in demand left Plaintiffs with a need for short-term funding and, ultimately, led to Plaintiffs entering purported MCA agreements with Defendants. (Id. at ¶ 25-28). Under a true MCA agreement, as explained by Defendants: (i) the loan is contingent upon actually receiving the future receivable being purchased; (ii) the maximum amount owed in any given draw would be "capped" to a "specified percentage" between 10-12%; and (iii) the term of the loan would be "flexible" and would automatically extend, as necessary, based on available cash. (Id. at ¶ 27; 37). Under true MCA agreements, the lender is required to "reconcile" the account each month to ensure only the "specified percentage" is actually deducted. (Id. at ¶ 37).

Although Defendants marketed their funding as MCAs, in reality and practice, they were usurious loans that were improperly enforced and resulted in immediate cash-flow shortfalls.

Defendants breached the original agreement, and every subsequent agreement, from the outset by over-drawing the daily amounts due under the loans, ignoring the "specified percentage" cap, refusing reconciliation, and, instead, mandating payment on fixed, inflexible, and unsustainable terms. (Id. at ¶¶ 31;38-42). In every conceivable way, the purported MCA agreements were clearly and unequivocally illegal loans designed to bankrupt Plaintiff while lining Defendants pockets with tens of millions of dollars in ill-gotten interest, fees, and commissions. (Id. at ¶ 40). Defendants clearly negotiated the MCA agreements based upon fixed, short-term, non-negotiable terms and, when the payment terms proved unsustainable, Defendants simply refinanced the loans. (Id. at ¶ 47).

All of the presently outstanding loans are merely refinances of prior illegal MCA agreements under which Defendants failed and refused to abide by the terms including, without limitation, the reconciliation provisions and, instead, required payment on fixed terms. (Id. at ¶¶ 32-33; 43). These massive refinance loans were also issued with short, fixed payoff terms, despite the express language in the agreements. (Id. at ¶ 46). By way of example, in April 2022, Defendant Gindi advised Plaintiffs that by refinancing existing loans with GREEN NOTE and KYF, Plaintiffs daily payments would "go up to $31,856 over 110 days" and "$33,529 over 160 days", respectively. (Id.; Exhibit A thereto).

To the best of the Company's knowledge, there are eight (8) refinance loans (disguised as MCA agreements) outstanding. (Id. at ¶ 66; Exhibits G through N thereto). The relevant financial terms are summarized as follows:

6

| Date | Lender | Refinance Amt. | Repayment Amt | Contract Interest Rate | Daily/Weekly Payment[1] | Specified % | Actual Term (days) | Effective Annual Interest Rate (approx.)[2] |
|---|---|---|---|---|---|---|---|---|
| 08/22/2022 | KYF | 4,000,000 | 5,840,000 | 46.0 | 32,444.44 day | 12 | 180 | 93 |
| 09/20/2022 | GN | 2,750,000 | 4,122,250 | 49.9 | 34,500 day[3] | 12 | 120 | 151.7 |
| 10/14/2022 | KYF | 2,500,000 | 3,747,500 | 19.9 | 21,000 day | 12 | 178 | 40.8 |
| 11/09/2022 | KYF | 1,500,000 | 2,025,000 | 35.0 | 7,888.46 day | 12 | 256 | 49.9 |
| 11/23/2022 | KYF | 1,050,000 | 1,732,500 | 65.0 | 33,317.31 week (7,759.61 day) | 12 | 223 | 106.4 |
| 11/23/2022 | KYF | 390,000 | 627,000 | 60.7 | 12,057.69 week (1,722.52 day) | 12 | 364 | 60.7 |
| 11/28/2022 | KYF | 1,000,000 | 1,650,000 | 65.0 | 31,730.76 week (4,532.96 day) | 12 | 364 | 65.0 |
| 01/18/2023 | KYF | 285,000 | 465,000 | 63.0 | None stated | 20 | N/A | |
| **TOTALS:** | | 13,475,000 | 20,209,250 | | **109,847.99 day** | **104%** | | |

Under these loans, the Company has purportedly pledged an impossible ***104% of its receivables*** and would be responsible for ***$109,847.99 daily*** – requiring annual revenues of in excess of $40 million simply to cover the debt.

The terms of the foregoing agreements are identical.  Although they contain a one-year term that is intended to automatically renew until the "specified percentage" repays the debt, in practice, the loans were negotiated and enforced on short, fixed terms.  (See E.g., Exhibit G to **Doc. 1** at ¶ 1.2).  The loans also include a reconciliation provision that required the lenders to "reconcile" the account on the 18th of each month to comply with the "specified percentage" (Id. at p. 1 and ¶ 2.12); again, Defendants ignored these requirements.  Each loan agreement contained a host of enforcement and security mechanisms in favor of Defendants including, by way of

---

[1] Where the loan provides a weekly rate, a daily rate has been calculated for purposes of comparison and calculation of total draws from the Company's accounts.

[2] The effective annual interest rate is calculated using the contract interest rate over a 365 day period.  For purposes of these calculation, additional fees and expenses that were not disbursed to Plaintiffs and would increase the effective interest rate have not been included.

[3] This loan also includes a $300,000 balloon payment that is at odds with an actual MCA; however, it has been disregarded for purposes of calculation.  It would, however, reduce the time for payment and increase the effective interest rate received.

example, a power of attorney-in-fact; personal guarantees, a confession of judgment, UCC liens, and an assignment of lease.  (Id. at ¶1.11; 1.12; p. 8-9).

Throughout their relationship, Defendants have used these loans to extort additional monies and interest, and to compel Plaintiffs to enter additional, unwanted loans.  By way of example, Defendant Gindi has extorted an additional $775,000 to his personal accounts for merely providing additional working capital and to "push through deals" to sustain the Company (Id. at ¶ 50; Exhibit B thereto).  Defendants have also improperly used these loans (and the guarantees, confessions of judgment, and other documents) to force the Plaintiffs to, among other things, hire new recruiters in an effort to expand to pay the debt (Id. at ¶ 56); meet with potential purchasers for the Company (Id. at ¶ 57); sign a Pledge Agreement to secure the debt (Id. at ¶ 60; Exhibit D thereto); and, ultimately, list the Company for sale under a deal in which Defendants would reap all the proceeds at closing.  (Id. at ¶¶ 62-63; Exhibits E and F thereto).

As it stands, Defendants continue to take all the cash out of the business, and then fund the purposefully created shortfall as "additional loans." (Id. at 67).  As a result, the Company has been forced to defer vendor payments.  (Id.).  Defendants have complete and absolute control over the Company's finances and closely monitor its bank accounts, releasing a "weekly allowance" to the Company in their sole discretion.  (Id. at ¶ 68; Exhibit O thereto).

Defendants have previously threatened to force Plaintiffs out-of-business and to take personal collection action against its executives and principals.  Defendants have also previously threatened and harassed Plaintiffs' customers and vendors.  (Id. at ¶ 71).  The very existence of the Company is in jeopardy, as is the livelihood of the over 2,000 nurses and other medical providers whom the Company employs.  (Id. at ¶ 70).  Unless the Court intercedes, the Company will collapse and Defendants illegal scheme will have succeeded.  (Id.).  The very first day that

Plaintiffs are unable to pay their providers, the Company will collapse and the thousands of individuals, institutions, and hospitals that rely upon the over 2,000 medical providers staffed by Plaintiffs will be left without care.  The circumstances of this case are dire, not only for the Company and its employees, but for those who rely on it for medical care.  (Id. at ¶ 72).

The Verified Complaint was filed on March 6, 2023 and asserts causes of action against Defendants for, *inter alia*, Civil RICO: 18 U.S.C. 1961 (Count One); Civil RICO Conspiracy 18 U.S.C. § 1962(d) (Count Two); Declaratory Judgment (Count Three); Breach of Contract (Count Four); Fraud (Count Five); Deceptive Practice Act, N.Y. Gen. Bus. Law § 349 (Count Six); Banking Law §§ 340 and 356 (Count Seven); Harassment (Count Eight); Unjust Enrichment/Disgorgement (Count Nine); Commercial Finance Disclosure Law § 803 (Count Ten); and Civil Extortion (Count Eleven). (Doc. 1).  The Verified Complaint includes a demand for injunctive relief.

On March 8, 2023, at approximately 6:00 p.m., prior to the filing of the within application, a copy of the Complaint, Order to Show Cause, Declaration of Counsel, and Memorandum of Law was sent via email to Defendants at the following known email addresses:

> ACE FUNDING SOURCE, LLC – info@bblawpllc.com
> GREEN NOTE CAPITAL PARTNERS, INC. – funding@greennotecapitalpartners.com;
> KYF GLOBAL PARTNERS, LLC –  kyf@globalpartners.com;
> PATRIARCH CAPITAL HOLDINGS, LLC – info@bblawpllc.com
> ACE FUNDING SOURCE SECOND, LLC - info@bblawpllc.com
> UNION FUNDING SOURCE, INC. – info@unionfundingsource.com
> MR. ALBERT GINDI – albertg@unitedsecuredcapital.com
> MR. ISAAC KASSAB – isaac@greennotecapitalpartners.com;
> MR. GABRIEL MANN – gabe@greennotecapitalpartners.com;

(Declaration of Nicholas A. Vytell, Esq. ("Vytell Decl.") filed herewith at ¶ 2; **Exhibit 1** thereto).

The transmittal correspondence expressly advised that injunctive relief and a temporary restraining order was being sought and would be filed with the Court.  (Id.).

9

**LEGAL ARGUMENT**

**I.      LEGAL STANDARD**

Pursuant to Fed. R. Civ. P. 65(b), a temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney if: (i) it appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (ii) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim  that notice should not be required.  see also Little Tor Auto Ctr. v. Exxon Co., USA, 822 F. Supp. 141, 143 (S.D.N.Y. 1993).

Ultimately, however, "the standard for a temporary restraining order is the same as for a preliminary injunction[,]" Jackson v. Johnson, 962 F. Supp. 391, 392 (S.D.N.Y. 1997), that is, that the moving party can establish: (i) a likelihood of success on the merits or sufficiently serious questions going to the merits; (ii) irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in its favor; and (iv) that an injunction is in the public interest.  See NAACP v. Town of E. Haven, 70 F.3d 219, 223 (2d Cir. 1995); Resolution Tr. Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991).   To obtain a preliminary injunction, a party need only demonstrate likelihood of success on one claim. See 725 Eatery Corp. v. City of New York, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019).  Courts within this District have routinely recognized that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983).  "'The purpose of a preliminary injunction is . . . to preserve the relative

10

positions of the parties.'" N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37-38 (2d Cir. 2018).

**II.    A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE NECESSARY TO PREVENT IMMEDIATE, IRREPARABLE HARM TO PLAINTIFFS, THEIR MEDICAL PROVIDERS, AND THEIR PATIENTS**

The evidence of irreparable harm is overwhelming and irrefutable in this case. Defendants have infiltrated the Company and, unless immediate injunctive relief is granted, have and will continue to withdraw every single penny that comes into the Company. Without immediate judicial intervention, the Company will default in paying the wages owed to its medical providers and will go under overnight.

Courts within this Circuit and in New York have routinely recognized that "the threatened destruction of a business fits within the definition of irreparable harm" sufficient to sustain injunctive relief. See Two Wheel Corp. v. American Honda Corp., 506 F. Supp. 806, 815 (E.D.N.Y. 1980), aff'd, 633 F.2d 206 (2d Cir. 1980); Am. Motor Club, Inc. v. Corcoran, 644 F. Supp. 862, 866 (S.D.N.Y. 1986); American Resources Corp. v. C6 Capital, LLC, 2020 NY Slip Op 34198(U), 2020 N.Y. Misc. LEXIS 10725 *9 (N.Y. Kings Cty., Dec. 16, 2020) ("Consequently, the plaintiffs have demonstrated a likelihood of success on the merits the loan was usurious. Moreover, the plaintiffs have presented irreparable harm that would result if the injunction is not granted.").

The evidence readily demonstrates that unless the Court intercedes, the Company will fail within hours. Pursuant to the usurious and illegal loans placed by Defendants, a total of 104% of Plaintiffs' receivables are pledged to Defendants and there is a daily payment due of nearly $110,000. Defendants have previously threatened, on countless occasions, to "put Plaintiffs out of business" if they failed to pay or failed to take on additional refinance loans. Defendants have,

11

and will continue, to deplete the Company's accounts such that, without judicial intervention, Plaintiffs will have absolutely no income to continue its operations.

Defendants are also currently armed with an arsenal of collection devices that they have hung over Plaintiffs' head for years including direct bank account access, attorney-in-fact designations, personal guarantees, consent judgments, UCC liens, and lease assignments. Perhaps most troubling, however, Defendants also demanded and obtained a Pledge Agreement (**Doc. 1** at ¶ 60; Exhibit D thereto) that they have continuously threatened to enforce if Plaintiffs failed to follow their every instruction. Pursuant to the terms of the Pledge Agreement, absent judicial intervention, Defendants will be able to sell, transfer, or otherwise dispose of the Company's pledged interests, in its sole discretion. It is readily apparent that absent judicial action, the Company will be lost.

If the Company were forced to close tomorrow, the ripple effect would be profound and disastrous. The nurses and other medical professionals that Plaintiffs employ would not have their wages paid, Plaintiffs would default under countless agreements, and the medical care for tens of thousands of individuals would be interrupted and jeopardized. The imminent harm to the Company, their employees, and the public is readily apparent and irrefutable. This injury is particularly more egregious because it was the express design of Defendants.

## III. THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

For many of the same reasons, the equities in this case and the public interest very clearly militate in favor of the issuance of a temporary restraining order and preliminary injunction. The injury to Plaintiffs, and the public which it serves, would be immediate and irreversible; whereas, the only arguable injury to Defendants would be delay in payment of their purported loans, which is clearly and routinely remedied if, and when, successful by an appropriate award of interest.

12

"A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. See Ligon v. City of New York, 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"). "[T]he Court looks to the nature of the harm to each side that will follow a decision either way[.]" Arthur v. Associated Musicians of Greater N.Y., 278 F. Supp. 400, 403 (S.D.N.Y. 1967).

At best, Defendants are creditors of Plaintiffs whose damages, if any, can be remedied by way of a final money judgment in this action after a full disposition on the merits. Defendants are also holders of countless liens, stock pledges, confessions of judgment, and other collection tools that, if successful, will potentially give them priority to collect any future judgment. Although Plaintiffs believe that the various agreements are the product of fraud and are otherwise unenforceable, Plaintiffs are not asking the Court to invalidate them at this time. Rather, Plaintiffs are simply seeking a stay of enforcement of these and other collection efforts pending a disposition on the merits. If Defendants are ultimately successful, they will be left in the same position as they currently stand and will suffer no injury by entry of an injunction.

On the contrary, as set forth above, Plaintiffs will be forced out of business should the Court fail or refuse to act. Its employees will be released, all of its contracts will go into default, its medical providers will go unpaid, and the Company will fail. Plaintiffs are in the medical industry and, therefore, the impacts of its demise will be felt immediately and profoundly by the public as the providers scramble to replace the displaced nurses and other providers. The equities clearly and unequivocally weigh in favor of injunctive relief to maintain the *status quo* pending disposition of this action on the merits.

Notably, the allegations in this case are serious and raise significant issues of fraud, extortion, and violation of civil RICO.  Plaintiffs' dire financial condition was orchestrated by Defendants with the express intent of taking control of the Company and, as the evidence demonstrates, forcing a sale for the sole benefit of Defendants.  In light of these allegations, supported by significant evidence in the record, it would be particularly troubling to permit Defendants to force Plaintiffs out of business, even while this action is proceeding before this Court.  This Court cannot, and should not, sit idly by as Defendants complete their destruction of Plaintiffs.

## IV.    THE CLAIMS AGAINST DEFENDANTS ARE LIKELY TO SUCCEED

Plaintiffs maintain that they are likely to succeed on all of the claims asserted against Defendants and to prevail upon the ultimate disposition in this action; however, for purposes of the present application and brevity, Plaintiffs focus on their claims for civil RICO (Counts One and Two), Breach of Contract (Count Four), and Extortion (Count Eleven).

The movant can establish a "likelihood of success" on the merits by a demonstration of a "better than fifty percent" probability of success, Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985), or, alternatively, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" meaning a question that is so "substantial, difficult and doubtful" as to require "a more deliberate investigation." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205-06 (2d Cir. 1970).

In perhaps the simplest of their claims, Plaintiffs allege a breach of contract claim (Count Four) against Defendants, including the Defendants that are parties to the outstanding MCA loans, for "refusing [and failing] "to reconcile the daily or weekly payments and have such payments be a true reflection of the daily receipts based on the amount of receivables allegedly purchased; (b) charging improper and undisclosed commissions and other fees; and (c) failing to fund the amount

14

required under the respective agreements." (**Doc. 1** at ¶¶ 105-107). The evidence to date and that will be adduced during discovery unequivocally demonstrates that Defendants ignored this contractual requirement; instead, demanding payment on fixed terms regardless of the amounts collected. The "specified percentages" were, in fact, so irrelevant to Defendants that the outstanding loans purportedly require Plaintiffs to pay 104% of its receivables to Defendants, a mathematically impossible task. Perhaps the most telling evidence of this breach is the fact that the loans at issue were *refinances* of prior loans placed by the very same Defendants. If, as the contracts require, Defendants had abided by the reconciliation provisions and only collected the "specified percentages" there is no instance in which a refinance of an existing MCA agreement would be needed. Defendants, however, ignored these terms, stacking their own loans on top of others. Plaintiffs are likely to succeed on these claims.

Plaintiffs are also likely to succeed on their civil extortion claim (Count Eleven) because the evidence readily demonstrates that Defendants, and their agents, coerced Plaintiffs to make additional payments, take on additional debt, and take additional actions as a result of illegal threats from Defendants. An extortion claim can be established through "wrongful use of fear of economic loss […] in which the evidence was plain that nonpayment would result in preclusion from or diminished opportunity for some existing or *potential* economic benefit." United States v. Covino, 837 F.2d 65, 68 n.1 (2d Cir. 1988). The evidence demonstrates that Defendant Gindi extorted nearly $775,000 from Plaintiffs under threat that he would not provide/release necessary working capital to the Company and would not "push through deals" to sustain the Company (Id. at ¶ 50; Exhibit B thereto). Defendants also improperly used its illicit loans (and the guarantees, confessions of judgment, and other documents) to force Plaintiffs to, among other things, hire new recruiters in an effort to expand to pay the debt (Id. at ¶ 56); meet with potential purchasers for the

Company (Id. at ¶ 57); sign a Pledge Agreement to secure the debt (Id. at ¶ 60; Exhibit D thereto); and, ultimately, list the Company for sale under a deal in which Defendants would reap all the proceeds at closing.  (Id. at ¶¶ 62-63; Exhibits E and F thereto).  These are clear examples of extortion.

Finally, and most fundamentally, the evidence will demonstrate that Defendants are collectively engaged in a civil-RICO enterprise to market, sell, collect, and enforce illegal loans under the guise of MCA agreements.  In Lateral Recovery LLC v. Queen Funding, LLC, 2022 WL 2829913 (21-cv 9607-LGS, S.D.N.Y. July 20, 2022)(**Exhibit 2** to Vytell Decl.), the Court recently examined the basis for such claims against MCA funders on terms and in a scheme almost identical to the facts in this case.  The Court denied the MCAs motion to dismiss civil RICO claims finding that the MCA agreements were, in reality, usurious loans and, as such, subjected the MCAs to potential liability for "collection of an unlawful debt" in violation of 18 U.S.C. § 1962(c).

A similar result was reached in Fleetwood Servs., LLC v. Ram Capital Funding, LLC, No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837, at *67 (S.D.N.Y. June 6, 2022)(**Exhibit 3** to Vytell Decl.), where the Court granted Plaintiff summary judgment on its RICO claim finding, in part, that the MCA agreements were "a loan and not a contract for the purchase of future receivables" and, as such, are subject to the applicable New York and Texas usury laws.  Under New York law, where Defendants are located the criminal usury rate is 25%, N.Y. Penal Law §190.40, and under Florida law, where Plaintiffs are located and the loans were issued, the civil usury rate is 18% and the criminal usury rate is   25%.  Florida Stat. § 687.071.  The rates on Defendants loans, including the loans still outstanding, far exceed these permissible rates, at times by 3-4 times.  These loans were an "unlawful debt" under civil RICO and subject Defendants to liability.

16

In addition to collecting an unlawful debt, Defendants are also liable under civil RICO for engaging in mail fraud, wire fraud, and extortion.  Each of which, separate and apart from the other, is sufficient to sustain a civil RICO claim where, as here, they were systemically used by the enterprise to commit fraud and carry on the purpose of making and collecting illegal loans.

Defendants, albeit inadvertently, all but admitted the conspiracy to Plaintiffs CEO when they explained that "the Entity Defendants were nothing more than 'shell companies' that they owned and/or operated to fund MCA agreements" with little or no assets and; instead, they "would solicit individual and entity investors (hereinafter "Investors") to fund loans with promises of returns of 20% or greater within 60-90 days.  As a result of these promises to Investors, Defendants engaged in the unlawful conduct set forth herein including, without limitation, ignoring the reconciliation terms of the MCA agreements and stacking MCA loans to refinance prior loans, in order to meet the promises to their Investors."  (**Doc. 1** at ¶ 35).  With that model, Defendants, necessarily, required new loans to repay the latest round of "Investors" the promised, exorbitant returns.  In order to accomplish this impossible feat, Defendants made the false, fraudulent, and misleading statements set forth in the Verified Complaint and engaged in unlawful collection practices to perpetuate their fraud.

Based upon the foregoing, Plaintiffs are highly likely to succeed on their civil RICO claims against all Defendants (and those to be named) on the basis of collection of an unlawful debt, extortion, mail fraud, and wire fraud.

17

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed

Order to Show Cause for Preliminary Injunction with Temporary Restraints.

Dated:  March 8, 2023                                    **REPPERT KELLY & VYTELL, LLC**

BY:     */s/ Nicholas A. Vytell*
                Nicholas A. Vytell, Esq.
                J. Vincent Reppert, Esq.
                110 Allen Road, Suite 208
                Basking Ridge, New Jersey 07920

                570 Lexington Avenue, 8th Floor
                New York, New York 10022
                Tel.    908.605.2120
                nvytell@RKVFirm.com
                jvreppert@RKVFirm.com
                ***Attorneys for Plaintiffs***

18